## DECLARATION IN SUPPORT OF CIVIL FORFEITURE COMPLAINT

I, Dan Peterie, a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI") assigned to the Dallas Field Office, being duly sworn, depose and state:

### I.     Introduction

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), Department of Justice, and have been so employed since January 7, 2018. As an FBI SA, I have participated in all the normal methods of investigation, including, but not limited to: electronic surveillance, visual surveillance, interviews of witnesses, the execution of search warrants, the use of confidential informants and cooperating witnesses, and the use and analysis of pen registers. I am vested with the authority to investigate violations of Federal laws, including Title 18 and Title 26, United States Code (U.S.C.).

2. The investigation described in this declaration was and is being conducted by the FBI.

3. I am familiar with the information contained in this declaration, either through personal investigation or through discussion with other law enforcement officers and employees, who have participated in and have contributed documentary reports of their investigative efforts in this matter. This declaration is based on personal knowledge I have gained from the participation in this investigation, as well as information relayed to me from other sources. Because I submit this declaration for the limited purposes described below, I have not included each and every fact I know concerning this investigation.

**Declaration: Page 1 of 17**

## II. Preview

4. This declaration describes how several conspirators defrauded Topgolf USA, Inc. (Topgolf) in a wire fraud/kickback scheme. The conspirators operated a scheme whereby one conspirator (a Topgolf employee) directed Topgolf projects/contract work to coconspirators in exchange for kickback payments. The conspirators then laundered those fraud proceeds by moving them through multiple bank accounts to conceal the fraud/kickback payments. Ultimately, a portion of the fraud proceeds were used to purchase various assets for the conspirators, to include real property.

## III. Real Property Sought for Forfeiture

5. I submit this declaration in support of a complaint that seeks civil forfeiture of the following real property:

| County | State | Address | Owner |
|---|---|---|---|
| Denton | TX | 6754 Gavin Dr., Frisco, TX 75034 | Rakesh Veerannagari |

## IV. Legal Authorities

6. Title 18, United States Code ("U.S.C."), §1343 prohibits a person from knowingly and willfully executing a scheme to defraud, or for obtaining money or property, by means of false or fraudulent pretenses, representations, or promises, by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

7. Title 18, U.S.C. § 1349 provides that any person who attempts or conspires to commit particular offenses, to include Section 1343, shall be subject to the same

penalties as those prescribed for the offense itself, the commission of which was the object of the attempt or conspiracy.

8. Title 18, U.S.C. § 1956 prohibits persons from conducting or attempting to conduct a financial transaction, knowing that the property involved in the financial transaction represents the proceeds of some unlawful activity,[1] with one of four specific intents,[2] and the property must in fact be derived from a specified unlawful activity.

9. Title 18, U.S.C. § 1957 prohibits persons from knowingly conducting a monetary transaction in criminally derived property in an amount greater than $10,000, which is, in fact, proceeds of a specified unlawful activity. The most significant difference from Section 1956 is the intent requirement. Under Section 1957, the four intents have been replaced with a $10,000 threshold amount for each non-aggregated transaction and the requirement that a financial institution be involved in the transaction.

---

[1] The specified forms of criminal activity are identified by the statute, in 18 U.S.C. § 1956(c)(7), which includes any act or activity constituting an offense listed in in section 1961(1), which includes a violation of 18 U.S.C. § 1343, wire fraud.

[2] In conducting the financial transaction, the defendant must have acted with one of the following four specific intents:
    1. § 1956(a)(1)(A)(i): intent to promote the carrying on of specified unlawful activity;
    2. § 1956(a)(1)(A)(ii): intent to engage in tax evasion or tax fraud;
    3. § 1956(a)(1)(B)(i): knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of proceeds of the specified unlawful activity; or
    4. § 1956(a)(1)(B)(ii): knowledge that the transaction was designed to avoid a transaction reporting requirement under State or Federal law.

**Declaration: Page 3 of 17**

10. Title 18, U.S.C., § 981(a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of Sections 1343 or 1349 is subject to civil forfeiture to the United States.[3]

11. Title 18, U.S.C., § 981(a)(1)(A) provides that any property, real or personal, involved in a transaction or attempted transaction in violation of Section 1956 or 1957, or any property traceable to such property, is subject to civil forfeiture to the United States.

12. Title 28 U.S.C. § 1355 provides that a forfeiture action may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.

13. Based on the legal authorities set forth above, and the facts and circumstances set forth below, I believe that the property listed in paragraph 5 of this declaration is subject to civil forfeiture pursuant to:

   a. 18 U.S.C. § 981(a)(1)(C), due to the properties being traceable to proceeds of health care fraud and conspiracy (18 U.S.C. §§ 1347 and 1349); and

   b. 18 U.S.C. § 981(a)(1)(A), due to the properties being involved in money laundering transactions or being traceable to other property involved in money laundering transactions (18 U.S.C. §§ 1956 and 1957).

---

[3] As incorporated by Title 18, U.S.C., § 1956(c)(7)(A).

**Declaration: Page 4 of 17**

## V.    Investigation Background, Evidence of Fraud

14.     Beginning in or around January 2024, FBI Dallas received allegations of a fraud scheme being carried out by an individual named Rakesh Veerannagari (Rakesh), and other known and unknown subjects, at/against Topgolf USA, Inc. ("Topgolf"), a company headquartered in Dallas, Texas. As a result of the allegations, FBI Dallas commenced an investigation.  The investigation revealed that Rakesh was employed by Topgolf as a Senior Manager of IT Data Analytics and was employed by Topgolf from April 2017 to October 2023.

15.     In his role at Topgolf, Rakesh hired and supervised IT contract work between Topgolf and external IT contractors.  Rakesh oversaw the relationship with Spiral Systems, Inc., an IT contract company that had multiple projects with Topgolf between 2018 and 2024. According to Topgolf representatives, Rakesh hired Spiral Systems, Inc. for projects managed by Rakesh, and he advocated for other Topgolf groups/teams to hire Spiral Systems, Inc.  According to Topgolf representatives and a contract (Master Service Agreement[4]) between Topgolf and Spiral Systems, Inc., Spiral Systems, Inc. was not permitted to subcontract Topgolf projects.

---

[4] Specifically, the Master Service Agreement stated, "Service Provider is not permitted to assign any portion of this MSA or Work, nor shall Service Provider utilize any lower tier subcontractors without prior written approval of Topgolf."

**Declaration: Page 5 of 17**

16. A review of bank records and corporate resolution documents show that the owner of Spiral Systems, Inc., was Madhan Gavini (Madhan), while Madhan and Srujana Gavini (Srujana) were both listed as the account holders for Spiral Systems, Inc.'s Merill Lynch bank account. The investigation revealed that the Madhan and Srujana, believed to be husband and wife, had a pre-existing friendship/business relationship with Rakesh. In fact, according to corporate filings with the state of West Virginia, Madhan and Rakesh were (two of the five) Corporate Officers/Registered Agents for VGV Foodmart WV LLC at least as early as October 18, 2016.

17. According to Topgolf representatives, Rakesh never disclosed his prior business relationship with the Gavinis during his employment. Rakesh further violated Topgolf policies and engaged in a scheme to defraud when he hired Spiral Systems, Inc. for projects, and advocated for other Topgolf groups/teams to hire Spiral Systems, Inc.

18. In late 2023, Topgolf representatives discovered that Rakesh was aware and concealed that Spiral Systems, Inc. was subcontracting work for Topgolf projects. In fact, Rakesh was communicating directly with a subcontractor regarding work on Topgolf projects.

19. One subcontractor that Rakesh communicated with was an individual by the name of Shiv Kumar. According to Shiv Kumar, who was interviewed by your affiant, Kumar and AICENCE, a technology service company based in India, were subcontracted by Spiral Systems, Inc. for Topgolf projects. According to Kumar, Rakesh regularly directed and tasked Kumar on Topgolf projects. In 2023, Kumar learned that

**Declaration: Page 6 of 17**

Rakesh was receiving money/kickback payments from the Topgolf-Spiral Systems Inc. contracts/projects. Specifically, Rakesh told Kumar that everyone was getting a "cut."

20. A review of Topgolf records and bank statements revealed that between September 2019 and 2024, Topgolf paid Spiral Systems, Inc. a total of approximately $5,438,018 for the various projects. During this same timeframe, approximately $1,011,023 was subsequently passed from Spiral Systems, Inc. through a bank account owned and controlled by the Gavinis[5] to a bank account owned/controlled by Rakesh's wife, Sunitha Veerannagari (formerly Sunitha Male, hereafter, "Sunitha") (LPARSYSTEMS LLC, Neighborhood Credit Union account ending #8181). The majority of the $1,011,023 received by Sunitha was subsequently moved to other bank accounts owned or controlled by Rakesh and Sunitha.

21. Beginning in or around February 2024, FBI Dallas opened an investigation after receiving allegations of a fraud scheme carried out by Rakesh Reddy Veerannagari (Rakesh), the former Senior Manager of IT Data Analytics at Topgolf USA, Inc. (Topgolf), a company headquartered in Dallas, Texas.

22. According to Topgolf records and Topgolf representatives interviewed by the FBI, Rakesh was Topgolf's Senior Manager of IT Data Analytics and was employed from April 2017 to October 2023. As part of his role at Topgolf, Rakesh oversaw the relationship with Spiral Systems, Inc., an IT contract company that had multiple projects

---

[5] Bank of America account ending #8336 in the name of Data Consulting, Inc.: According to records provided by Bank of America, Srujana was the sole signer on the account from September 19, 2019, until Madhan was added as a signer on or about March 20, 2021.

**Declaration: Page 7 of 17**

with Topgolf. According to Topgolf representatives, in addition to hiring Spiral Systems, Inc. for projects managed by Rakesh, Rakesh advocated for other Topgolf groups/teams to hire Spiral Systems, Inc.

A. Tracing of Proceeds

|   | Financial Institution | Account Number | Name on Account | Account Open Date | Name as Further Used Herein |
|---|---|---|---|---|---|
| 1. | Bank of America | x2787 | Spiral Systems, Inc. | 07/03/2015 | "BOA-SS-2787" |
| 2. | Bank of America | x8336 | Data Consulting Inc. | 09/19/2019 | "BOA-DC-8336" |
| 3. | Neighborhood Credit Union | x8181 | LPARSYSTEMS LLC | Prior to 01/01/2018 | "NCU-LPAR-8181" |
| 4. | PointBank | x6489 | Rakesh R. Veerannagari, Sunitha Male | 01/07/2017 | "PB-6489" |

23.  On or about July 3, 2015, Madhan opened Bank of America account ending #2787 in the name of Spiral Systems, Inc. ("BOA-SS-2787") According to the signature card, Madhan was the President of Spiral Systems, Inc. and the only signer on the account.

24.  According to Accurint and New Jersey Department of the Treasury filings, Srujana Gavini was the Registered Agent of Data Consulting, Inc., a company registered in New Jersey on or about August 30, 2019. On or about September 19, 2019, Srujana opened Bank of America account ending #8336 in the name of Data Consulting Inc.

**Declaration: Page 8 of 17**

("BOA-DC-8336"). According to the Corporate Resolution provided by Bank of America, Srujana was the President of Data Consulting Inc. On or about March 20, 2021, Madhan was added to the signature card for BOA-DC-8336.

25. According to Texas Secretary of State filings, Sunitha was the manager and owner of LPARSYSTEMS LLC, a company registered on or about December 7, 2012. According to information provided by Neighborhood Credit Union, including a Membership Master Agreement (Signature Card) dated September 15, 2021, Sunitha was the only signer on Neighborhood Credit Union account ending #8181 in the name of LPARSYSTEMS LLC ("NCU-LPAR-8181").

26. Between September 2019 and January 2024, BOA-SS-2787 received approximately $5,438,018 in payments from Topgolf. During the same timeframe (September 2019 to January 2024), BOA-SS-2787 received other deposits totaling only $1,061,055. In total, during this timeframe, approximately 84% of the deposits to BOA-SS-2787 were from Topgolf. A breakdown of deposits (from Topgolf and other credits) to BOA-SS-2787 is below.

| Year/Timeframe | Credits to BOA-SS-2787 | | | | |
|---|---|---|---|---|---|
| | Topgolf | Other Credits | Total | Topgolf | Other Credits |
| 2019 (Sep-Dec) | $ 361,562 | $ 69,660 | $ 431,222 | 84% | 16% |
| 2020 | $ 739,605 | $ 287,729 | $ 1,027,334 | 72% | 28% |
| 2021 | $ 922,471 | $ 192,388 | $ 1,114,859 | 83% | 17% |
| 2022 | $ 1,570,137 | $ 492,097 | $ 2,062,234 | 76% | 24% |
| 2023 | $ 1,699,267 | $ 1,180 | $ 1,700,447 | 100% | 0% |
| 2024 (Jan) | $ 144,976 | $ 18,000 | $ 162,976 | 89% | 11% |
| **Totals** | **$ 5,438,018** | **$ 1,061,055** | **$6,499,073** | **84%** | **16%** |

**Declaration: Page 9 of 17**

27. Between September 2019 and January 2024, BOA-SS-2787 distributed $1,208,500 to BOA-DC-8336. Given 84% of deposits to BOA-SS-2787 were from Topgolf, it is reasonable to believe the majority of the distributions to BOA-DC-8336 were funded by Topgolf proceeds.

28. As previously noted, between September 2019 and January 2024, BOA-SS-2787 sent approximately $1,208,500 million to BOA-DC-8336. During the same timeframe (September 2019 to January 2024), BOA-DC-8336 received other deposits totaling only $4,350. As outlined in the table below, approximately 99.6% of deposits to BOA-DC-8336 were funded by BOA-SS-2787.

| Year/Timeframe | Credits to BOA-DC-8336 | | | | |
| --- | --- | --- | --- | --- | --- |
| | From BOA-SS-2787 | Other Credits | Total | From BOA-SS-2787 | Other Credits |
| 2019 (Sep-Dec) | $ 116,500 | $ 100 | $ 116,600 | 99.9% | 0.1% |
| 2020 | $ 136,050 | $ 1,030 | $ 137,080 | 99.2% | 0.8% |
| 2021 | $ 169,800 | | $ 169,800 | 100.0% | 0.0% |
| 2022 | $ 332,200 | $ 2,416 | $ 334,616 | 99.3% | 0.7% |
| 2023 | $ 424,950 | $ 166 | $ 425,116 | 100.0% | 0.0% |
| 2024 (Jan) | $ 29,000 | $ 638 | $ 29,638 | 97.8% | 2.2% |
| Totals | $ 1,208,500 | $ 4,350 | $1,212,850 | 99.6% | 0.4% |

29. Between September 2019 and January 2024, BOA-DC-8336 sent NCU-LPAR-8181 approximately $1,011,023. As previously noted, during this timeframe (September 2019 to January 2024), BOA-DC-8336 received deposits totaling $1,212,850.12 consisting of $1,208,500 (99.6%) from BOA-SS-2787, and only $4,350.12 (0.4%) from other sources; therefore, the majority of the funds sent to NCU-LPAR-8181 were funded by BOA-SS-2787.  As outlined in the table below, credits to NCU-LPAR-8181 were almost entirely funded by BOA-DC-8336.

**Declaration: Page 10 of 17**

| Credits: NCU-LPAR-8181 | Amount ($) | (%) |
|---|---|---|
| BOA-DC-8336 | $ 1,011,023 | 99.99% |
| Other Credits | $ 87 | 0.01% |
| **Total** | **$ 1,011,110** | **100.00%** |

30.   Given the majority of the funds received by BOA-DC-8336 were subsequently paid to NCU-LPAR-8181, an account owned and controlled by Sunitha, it is reasonable to believe that BOA-DC-8336 was opened and utilized in an effort to conceal that funds were being paid from Madhan and Spiral Systems, Inc. to the benefit of Rakesh. In my training and experience accounts such as these, BOA-DC-8336, are sometimes referred to as shell bank accounts, essentially a bank account used for the core purpose of obscuring the origin(s) and destination(s) of funds.

31.   Between September 2019 and January 2024, the majority of the funds in NCU-LPAR-8181 were distributed to bank accounts owned or controlled by Rakesh and/or Sunitha, including, but not limited to, PointBank account ending #6489 in the name of Rakesh R. Veerannagari, Sunitha R. Veerannagari ("PB-6489"). According to records provided by Point Bank, PB-6489 was opened on January 7, 2017, with signers Rakesh R. Veerannagari and Sunitha Male. Between September 2019 and January 2024, NCU-LPAR-8181 distributed approximately $414,882.90 to PB-6489.

32.   As outlined below, the majority, approximately 66%, of all deposits to PB-6489 during this timeframe were funded by NCU-LPAR-8181.

**Declaration: Page 11 of 17**

| Credits to PB-6489 | | | | | |
|---|---|---|---|---|---|
| Year/Timeframe | NCU-LPAR-8181 | Other Credits | Total | NCU-LPAR-8181 | Other Credits |
| 2019 (Sep-Dec) | $ 31,878 | $ 4,818 | $ 36,696 | 87% | 13% |
| 2020 | $ 47,296 | $ 17,869 | $ 65,165 | 73% | 27% |
| 2021 | $ 56,255 | $ 20,627 | $ 76,883 | 73% | 27% |
| 2022 | $ 113,421 | $ 53,433 | $ 166,854 | 68% | 32% |
| 2023 | $ 151,006 | $ 116,511 | $ 267,518 | 56% | 44% |
| 2024 (Jan) | $ 15,027 | $ 2 | $ 15,029 | 100% | 0% |
| **Totals** | **$ 414,883** | **$ 213,261** | **$ 628,143** | **66%** | **34%** |

**Subject Property: 6754 Gavin Dr, Frisco, TX 75034**

33. According to the Texas General Warranty Deed for the Subject Property, the recorded owner/grantee is Rakesh R. Veerannagari(m), while the grantor is listed as Landon Homes, LP, a home building company located in Frisco, Texas. The Texas General Warrant Deed for the Subject Property was recorded on or about May 28, 2020.

34. A review of PB-6489 and records obtained from Stewart Title identified the below payments to Landon Homes, totaling $30,680.00, for the Subject Property.

    a. Payments to Landon Homes from PB-6489
        i. 11/4/2019 - $5,000.00
       ii. 12/11/2019 - $25,415.00
      iii. 12/18/2019 - $265.00

35. According to records obtained from Experian Credit Union (Experian), Rakesh obtained a 30-year real estate mortgage with Supreme Lending (also referred as Everett Financial, Inc. DBA Supreme Lending) in May 2020 for $490,000. Given the timing of the Supreme Lending loan (May 2020) and the Subject Property's deed/title recorded date (May 28, 2020), it is reasonable to believe the Supreme Lending loan was for the Subject Property. According to Experian records, the last payment on the Supreme Lending loan was January 2021.

**Declaration: Page 12 of 17**

36. A review of PB-6489 identified the below payments to Supreme Lending totaling $17,587.50, reasonably believed to be for the Subject Property.

    a. Payments to Everett Financial, Inc. DBA Supreme Lending from PB-6489
        i. 6/30/2020 - $2,512.50
        ii. 8/4/2020 - $2,512.50
        iii. 9/2/2020 - $2,512.50
        iv. 10/2/2020 - $2,512.50
        v. 11/3/2020 - $2,512.50
        vi. 12/2/2020 - $2,512.50
        vii. 1/5/2021 - $2,512.50

37. According to records obtained from Experian, in January 2021, Rakesh obtained a 30-year real estate mortgage in the amount of $488,000 with and/or serviced by PennyMac Loan Services (hereafter "PennyMac"). On or about February 4, 2021, a Deed of Trust for the Subject Property was filed referencing the promissory note signed by Rakesh on January 28, 2021, in the amount of $488,000. Based on the timing and the amount of the PennyMac loan, it is reasonable to believe the PennyMac loan was for the Subject Property, replacing the Supreme Lending loan. Experian records further indicate the monthly payment for the PennyMac loan, as of March 2024, was approximately $3,870.

38. A review of PB-6489 identified the below payments to PennyMac Loan Services, LLC totaling $103,927.80, reasonably believed to be for the Subject Property.

    a. Payments to PennyMac Loan Services, LLC from PB-6489 ($103,927.80)
        i. 4/2/2021 - $2,264.89
        ii. 5/3/2021 - $2,264.89
        iii. 6/2/2021 - $2,264.89
        iv. 7/2/2021 - $2,264.89
        v. 8/2/2021 - $2,264.89
        vi. 9/2/2021 - $2,264.89

      vii. 10/4/2021 - $2,264.89
     viii. 11/2/2021 - $2,264.89
       ix. 12/2/2021 - $2,264.89
        x. 1/3/2022 - $2,264.89
       xi. 2/2/2022 - $2,264.89
      xii. 3/2/2022 - $2,264.89
     xiii. 4/4/2022 - $3,170.71
     xiv. 5/2/2022 - $3,170.71
      xv. 6/2/2022 - $3,170.71
     xvi. 7/5/2022 - $3,170.71
     xvii. 8/2/2022 - $3,170.71
    xviii. 9/2/2022 - $3,170.71
     xix. 10/3/2022 - $3,170.71
      xx. 11/2/2022 - $3,170.71
     xxi. 12/2/2022 - $3,170.71
     xxii. 1/3/2023 - $3,170.71
    xxiii. 2/2/2023 - $3,170.71
    xxiv. 3/2/2023 - $3,170.71
     xxv. 4/3/2023 - $3,870.06
    xxvi. 5/2/2023 - $3,870.06
    xxvii. 6/2/2023 - $3,870.06
   xxviii. 7/3/2023 - $3,870.06
    xxix. 8/2/2023 - $3,870.06
     xxx. 9/5/2023 - $3,870.06
    xxxi. 10/2/2023 - $3,870.06
    xxxii. 11/2/2023 - $3,870.06
   xxxiii. 12/4/2023 - $3,870.06
   xxxiv. 1/2/2024 - $3,870.06

39. According to records provided by Stewart Title and PointBank pursuant federal grand jury subpoenas, PB-6489 funded a $16,050.13 cashier's check on May 27, 2020, for closing costs for the Subject Property.

40. As outlined above, between November 2019 and January 2024, payments from PB-6489 for the Subject Property (to Landon Homes, Everett Financial, Inc. DBA

**Declaration: Page 14 of 17**

Supreme Lending, PennyMac Loan Services, LLC, and Stewart Title) totaled approximately $168,245.43.

41. As previously noted, during the September 2019 to January 2024 timeframe, PB-6489 was mostly funded by NCU-LPAR-8181 as outlined below; therefore, it is reasonable to believe the $168,245.43 paid towards the Subject Property was funded by fraudulent funds.

| Credits to PB-6489 | | | | | |
|---|---|---|---|---|---|
| Year/Timeframe | NCU-LPAR-8181 | Other Credits | Total | NCU-LPAR-8181 | Other Credits |
| 2019 (Sep-Dec) | $ 31,878 | $ 4,818 | $ 36,696 | 87% | 13% |
| 2020 | $ 47,296 | $ 17,869 | $ 65,165 | 73% | 27% |
| 2021 | $ 56,255 | $ 20,627 | $ 76,883 | 73% | 27% |
| 2022 | $ 113,421 | $ 53,433 | $ 166,854 | 68% | 32% |
| 2023 | $ 151,006 | $ 116,511 | $ 267,518 | 56% | 44% |
| 2024 (Jan) | $ 15,027 | $ 2 | $ 15,029 | 100% | 0% |
| **Totals** | **$ 414,883** | **$ 213,261** | **$ 628,143** | **66%** | **34%** |

## IX. Conclusion

42. Based on the foregoing, Rakesh Veerannagari and Sunitha Veerannagari used funds traceable to a wire fraud scheme to purchase the Subject Property.

43. The payments that Rakesh and Sunitha made to the lenders/mortgage servicing company, title companies, and builders were each a violation of Title 18, U.S.C. § 1956. For each payment, Rakesh and Sunitha conducted a financial transaction, knowing that the property involved in the financial transaction represented the proceeds of some unlawful activity, and the property was in fact derived from a specified unlawful activity.

44. The $25,415.00 payment that Rakesh and Sunitha made to the builder and the $16,050.13 payment that Rakesh made to Stewart Title were also violations of Title 18, U.S.C. § 1957, as were most of the payments from BOA-SS-2787 to BOA-DC-8336, most of the payments from BOA-DC-8336 to NCU-LPAR-8181, and several of the payments from NCU-LPAR-8181 to PB-6489. For these payments, Madhan, Srujana, Rakesh and/or Sunitha knowingly conducted monetary transactions in criminally derived property in an amount greater than $10,000, which was, in fact, proceeds of a specified unlawful activity, and a financial institution was involved in each instance.

45. The Subject Property listed in paragraph 5 is subject to civil forfeiture to the United States under Title 18, U.S.C., § 981(a)(1)(C), because it constitutes or is derived from proceeds traceable to a violation of Sections 1343 or 1349.

46. The Subject Property listed in paragraph 5 is also subject to civil forfeiture to the United States under Title 18, U.S.C., § 981(a)(1)(A), because they were involved in a transaction in violation of Section 1956 or 1957, or they were traceable to other property involved in a transaction in violation of Section 1956 or 1957.

47. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July __03__, 2024.

*Dan Peterie*
Dan Peterie
Special Agent
Federal Bureau of Investigation

**Declaration: Page 16 of 17**

Timeframe
September 2019 – January 2024



Spiral Systems Inc., BOA #2787 (BOA-SS-2787)
Signer: Madhan Gavini
Total Deposits: $6,499,073
Topgolf Deposits: $5,438,018 (84%)



Data Consulting Inc., BOA #8336 (BOA-DC-8336)
Signers: Srujana Gavini,- Mahdan Gavini
Total Deposits: $1,212,850
Deposits from BOA-SS-2787: $1,208,500 (99.6%)



LPARSYSTEMS, LLC, NCU #8181 (NCU-LPAR-8181)

Signer: Sunitha Veerannagari
Total Deposits: $1,011,110
BOA-DC-8336 Deposits: $1,011,023 (99.9%)



Rakesh R. Veerannagari. Sunitha R. Veerannagari
Point Bank #6489 (PB-6489)
Signers: Rakesh R. Veerannagari, Sunitha Male
Total Deposits: $628,123
Deposits from NCU-LPAR-8181: $414,883 (66%)

Subject Property: 6754 Gavin Dr, Frisco, TX 75034
Funded by PB-6489: $168,245.43

**Declaration: Page 17 of 17**